Jason B. Lattimore
**The Law Office of**
**JASON B. LATTIMORE, ESQ. LLC**
55 Madison Avenue, Suite 400
Morristown, NJ 07960
Telephone: (973) 998-7477
Facsimile:  (973) 264-1159
Jason@Lattimorelaw.com

*Counsel for Plaintiff,*
*Interlink Products International, Inc.*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| INTERLINK PRODUCTS INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> ABORDER PRODUCTS, INC., <br><br> Defendant. | Case No: 2:24-cv-04591 <br><br> **COMPLAINT &** <br> **JURY TRIAL DEMAND** |

Plaintiff, Interlink Products International, Inc. (hereinafter "Interlink" or "Plaintiff"), by and through its undersigned attorney, hereby complains of Defendant, Aborder Products, Inc. ("Defendant"), as follows:

### THE PARTIES

1. Plaintiff is a New Jersey corporation with its principal place of business at 1315 East Elizabeth Avenue, Linden, New Jersey 07036.

2. On information and belief, Defendant is a Texas corporation that lists its business address as 511 E John Carpenter Fwy, Ste. 500, Irving, TX 75062-8138.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction over the claims alleged pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. § 1331. The Court also has jurisdiction over the claims pursuant to 28 U.S.C. § 1367(a) in that the state law claims alleged are so related to the claims over which the Court has original jurisdiction that they form part of the same case.

4. This Court has personal jurisdiction over Defendant in that defendant does business regularly in this district and the claims at issue in this case arise out of or are related to Defendant's business activities with respect to this district. Defendant regularly advertises, offers for sale, and ostensibly ships and sells, to customers located in New Jersey, products that bear or are sold under the false and misleading statements at issue in this case. Defendant also knowingly and intentionally causes the products that are the subject of the false and misleading statements at issue to be advertised, promoted, and sold in New Jersey. Defendant thus purposely directs its business activities to this forum and the claims herein thereby arise out of and relate to such business activities.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c).

**NATURE OF THE CLAIMS**

6. This case arises out of Defendant's false and misleading representations regarding its showerhead products sold on Amazon.com ("Amazon"). Defendant's misrepresentations include promoting its showerheads as water-saving 1.8 gallon-per-minute (gpm) products when, in fact, those showerheads greatly exceed statutory waterflow rate limits and waste water. Defendant engages in this practice in order to (1) evade Amazon's regulatory safeguards that precent the sale of noncompliant showerheads on the platform; (2) evade enforcement action by the Department of Energy and the California Energy Commission, the two regulatory bodies

affected by Defendant's scheme; and (3) to gain a tremendous competitive advantage over compliant showerhead sellers, like Interlink, by selling high flow showerheads that garner higher customer ratings and sales than most compliant showerheads. Defendant employs additional misrepresentations regarding the characteristics of its products and those of Interlink in Defendant's advertising, all of which has caused Interlink significant competitive injury. Interlink seeks all available relief with respect to Defendant's conduct, including enhanced disgorgement of profits and an award of attorneys' fees and costs.

## FACTS

7. Interlink is a New Jersey based company specializing in the development, production and marketing of shower and bath products. The company was founded in 1996.

8. Interlink's products include several lines of showerheads that can be purchased from various sources, including Amazon. Interlink estimates that it is the leading seller of showerheads on Amazon.

9. Defendant is a Texas company that competes directly with Interlink for sales of showerheads to consumers who purchase products through Amazon.

10. On information and belief, Defendant is the U.S. agent, subsidiary, or affiliate of one or more Chinese companies, and conducts business in the U.S. on behalf of or in a joint venture relationship with its Chinese affiliate(s).

11. Defendant sells its showerheads under the VEKEN brand.

<u>Defendant Misrepresents the Flow-Rate Characteristics of Its Products</u>

12. The Energy Policy Act (42 U.S.C. §§ 6291-6309) and the regulations promulgated pursuant thereto (collectively the "EP Act") require that showerheads manufactured after January 1, 1994 have a maximum flow rate of "2.5 gallons per minute (9.5 liters per minute) when

3

measured at a flowing pressure of 80 pounds per square inch gage (552 kilopascals)." 10 CFR Part 430.32(p); 42 U.S.C. § 6295(j). Federal law thus requires any consumer showerhead sold in the United States to have a maximum water flow rate of 2.5 gallons per minute ("gpm") at 80 pounds per square inch ("psi") of water pressure as sold.

13. Some states have more restrictive limits on the flow rates of showerheads that can be sold within their borders. For example, California has a 1.8 gpm (at 80 psi) flow rate limit.

14. Compliance with applicable flow rate regulations is typically achieved through installation of a flow restrictor in the water inlet of a showerhead to limit the flow of water entering the showerhead to the specified flow rate.

15. In order to be compliant with applicable law, a showerhead must have appropriate flow restriction installed at the time of sale. Supplying the restrictor as a separate component in the product packaging does not satisfy applicable regulatory requirements. The Energy Policy Act requires that, for showerheads that use a flow restrictor to achieve flow rate compliance, the restrictor must be installed and "mechanically retained" in the showerhead "at the point of manufacture." 10 CFR Part 430.32(p); 42 U.S.C. § 6295(j).

16. Both the United States Department of Energy ("DOE") and the California Energy Commission ("CEC") – the agencies that enforce showerhead flow rate regulations on the federal and California state levels, respectively – require showerhead sellers to register their showerheads and submit corresponding certifications of compliance with applicable flow rate regulations and other applicable regulations.

17. To sell showerheads legally in California, showerhead sellers must test their products at CEC-approved laboratories and receive third-party certification. Once certified, sellers

are required to submit their documentation and data to the CEC to be uploaded into the agency's online Modernized Appliance Efficiency Database System ("MAEDbS")

18. MAEDbS is publicly accessible and searchable. One of the purposes of MAEDbS is to allow consumers to confirm the compliance status of a given product when making the determination of whether to purchase the product.

19. Similarly, DOE maintains a Compliance Certification Database, where sellers must register compliance data for their showerheads. Compliance certification information filed with DOE is available through DOE's eeCompass service, which is a publicly available source for consumers and others to verify and compare the efficiency of showerheads and other regulated products.

20. Defendant deceives consumers by advertising its showerheads as efficient 1.8 gpm, California-compliant products.

21. Defendant engages in the further deceptive practice of falsely certifying the compliance of its products to CEC and DOE, representing that the products have maximum flow rates of 1.8 gpm or less when, in fact, they do not.

22. Defendant even goes so far as to advertise it "has helped consumers save billions of gallons of water" with its showerheads, as reflected below, even though the showerheads have caused customers to waste billions of gallons of water.



23. In truth, Defendant's showerheads are sold without flow restrictors installed. They are high-flow showerheads that waste water and are not compliant with water conservation regulations.

24. Interlink had Defendant's top-selling products shipped directly from Amazon to an accredited testing lab where those products were inspected and tested for compliance. The results of that testing, as it pertains to flow rate compliance, are summarized in the following table:

| Tested Veken Model | Tested Max Flow Rate | Amazon ASIN | Model # / ASIN of Same Product In Different Finishes |
|---|---|---|---|
| FSR5V101 | 8.0 gpm | B0BJ2TKLPF | FSR5V106 / B0C4LGB4XZ (chrome/blk)<br>FSR5V102 / B0C2HV91SZ (black) |
| SHF3V101 | 3.0 gpm | B0C7GR6J2Z | SHF3V102 / B0C7GQHXZ2 (black) |
| SHP5V101 | 2.4 gpm | B0C7GRGZPD | SHP5V102 / B0C7GPBF9T (black) |
| SHC5V201 | 3.6 gpm | B0C8611GZV | SHC5V202 / B0C861Z85Y (black) |
| SHC5V205 | 5.8 gpm | B0C86444ZY | SHC5V206 / B0C8641H2K (black) |
| VK062382US | 5.5 gpm | B09XD3R73G | n/a |

25. As reflected in the attached Exhibit A, Defendant falsely advertises and falsely certified to regulatory authorities the flow rates of each of the tested models.

26. Defendant engages in the same deceptive conduct with respect to each alternative finish variation of each tested model.

27. On information and belief, Defendant engages in the same deceptive conduct with respect to all of its showerheads.

28. Defendant employs its deceptive practices not only to deceive consumers and gain access to the Amazon platform generally, but also to gain access to customers in California through the Amazon platform.

29. Compliance with applicable regulations is a precondition to selling products on Amazon.

30. Amazon has implemented specific safeguards aimed at preventing the sale of noncompliant products to California customers. The Amazon platform automatically prevents shipment of showerheads to California addresses unless the showerheads are registered with the state of California as compliant and listed on Amazon as having 1.8 gpm or lower flow rates.

31. Falsely listing products on Amazon as 1.8 gpm California-compliant models, together with fraudulently listing the products as compliant in MAEDbS, allows Defendant to circumvent Amazon's safeguards designed to prevent the sale of non-compliant showerheads to California.

32. Falsely listing products as having 1.8 gpm flow rates in the DOE compliance certification database furthers Defendant's scheme.

33. None of Defendant's showerheads sent for testing complied with California's 1.8 gpm flow rate limit and none complied with the maximum flow rates Defendant certified to DOE. On the contrary, Defendant's showerheads deliver water at astonishing flow rates of up to 8 gpm.

34. Defendant's tactics not only have allowed it to successfully evade both Amazon rules and enforcement by CEC and DOE to date, but also have rewarded Defendant with a dramatic increase in product ratings, exposure and sales. When customers experience up to four-times higher flow rate and pressure delivered by these non-compliant high-flow showerheads, they give them much higher ratings and better reviews than those offered by compliant competitors. This leads to more sales and higher rankings on Amazon, which, in turn, leads to even greater sales. This puts Interlink (a compliant seller) at a tremendous competitive disadvantage and diverts sales from Interlink.

35. In other words, Defendant falsely represents the qualities of its products to consumers and regulatory authorities, and otherwise breaks the law, to offer its showerheads for sale on Amazon and cheat competitors (primarily Interlink) out of showerhead sales.

36. Showerhead pressure (the force of the water stream produced by the showerhead) is a central selling point for showerheads. The ability of a showerhead to provide superior (or higher) pressure is very important to prospective purchasers, as that characteristic is a major factor in determining the quality of the showering experience a showerhead will provide. Further, flow pressure and a user's perception of how much water is flowing out of a showerhead factor greatly into a purchaser's evaluation of the performance of a showerhead.

37. Customers purchase and at all relevant times purchased Defendant's showerheads believing they are compliant showerheads (based on Defendant's representations). When they receive and install them, assuming a particular showerhead is not defective, they put out a much greater amount of water than a truly compliant showerhead due to the fact that a flow restrictor is not installed.

38. Customers typically have been very pleased with the performance of Defendant's high-flow, noncompliant showerheads and, as a result, were more likely give the showerheads high product ratings and reviews that, in the eyes of prospective purchasers, reinforce the notion that the showerheads outperform those of competitors.

39. Defendants further reinforce this misperception by including misleading comparative advertising in their product listings, showing their own showerheads providing a powerful vertical stream of water next to another showerhead barely putting out any stream, as reflected in the example below.



40. The only way Defendant obtained such comparative images was to greatly reduce water flow to the showerhead on the right in the above image while allowing full flow to their own showerhead, on the left. Defendant utilizes this deceptive practice across its showerhead product lines.

41. Thus, Defendant unfairly competes and has unfairly competed with Interlink by reason of the fact that customers are misled to believe that Defendant's showerheads have inherently superior water flow characteristics as compared to Interlink's showerheads when, in fact, they do not.

42. Interlink's showerheads contain flow restrictors. Further, those showerheads provide similar, if not superior, spray force and shower experience (with the flow restrictors

9

removed) as compared to Defendant's illegal showerheads. However, customers are unlikely to realize Defendant's showerheads do not contain flow restrictors, the real reason why Veken products perform so well in water pressure and flow volume, and believe the showerheads simply outperform the products of others. That false belief is reflected in and reinforced by the customer reviews of Defendant's products, which are artificially inflated by Defendant's unlawful conduct.

43. Defendant therefore benefits greatly from its deceptive and unlawful showerhead sales in a manner that is permanently attached to its sale of products under the reviews generated from Defendant's deceptive and unfair practices.

44. Defendant has also gained an unfair advantage over Interlink by exploiting customers' reluctance to alter products. Some customers may be reluctant to go through the process of removing the flow restrictor from a compliant product or adding restrictors to a non-compliant product, which exacerbates Defendant's unfair advantage from its illegal sales.

45. Most of Defendant's products would literally fail to function, or at least fail to function properly, if they had compliant flow restriction, as advertised, due to the large number of spray nozzles those products contain and their large size. There simply would not be enough water flow through those products at compliant flow rates to provide the spray force necessary to shower using the products.

46. Showerhead regulatory certification, efficiency, flow rate, comparative performance, and specifications are material to consumers in the market for showerheads.

47. Water conservation and water savings without sacrificing performance and regulatory compliance with respect to flow rate are material to purchasers.

48. The ability to acquire a showerhead that provides a good showering experience at legally compliant or lower flow rates (thereby saving the customer money) is a key selling point in the showerhead market.

Defendant Misrepresents that Its Products Have Nozzles Made of Self-Cleaning Material

49. Defendant falsely represents that its combo showerheads have nozzles made of a special material that keeps the nozzles clean on a 24/7 basis. Examples of Defendant's advertising to that effect are attached as Exhibit B.

50. Defendant's showerheads do not have nozzles with any such material.

51. Whether a showerhead has self-cleaning nozzles that prevent the accumulation of contaminants on a 24/7 basis is material to consumers in the market for showerheads. Among other benefits, such a feature can affect the appearance and lifespan of the nozzles and reduce exposure to microbes and other substances during showering.

Defendant Misrepresents that Interlink's Combo Showerhead Components Corrode

52. Defendant employs, in its advertising, an image of Interlink's patented water diverter used in Interlink's combo showerhead products.

53. Interlink's water diverter employs a distinctive locknut component that is readily recognizable on the product and is displayed in Interlink's advertising.

54. Defendant's image of Interlink's locknut and diverter portrays those components as having extensive corrosion.

55. Both the locknut and Interlink's diverter are made of ABS plastic that cannot corrode.

56. On information and belief, Defendant used paint or other substances to make it appear as if the Interlink diverter was corroded when, in fact, it was not.

57. Defendant's falsified image of Interlink's diverter and locknut is attached as Exhibit C.

58. Whether a showerhead is susceptible to corrosion is material to consumers in the market for showerheads.

<u>Defendant Misrepresents that Its Showerhead Filters Improve Dandruff and Reduce Hair Loss</u>

59. Defendant advertises that the filters in its handheld showerheads improve dandruff and hair loss, as reflected in the example of Defendant's advertising below.








60. Defendant's claims that its showerhead filters improve dandruff and hair loss are unsubstantiated.

61. On information and belief, Defendant's showerhead filters do not contain any properties, components, or ingredients demonstrated to improve dandruff or reduce hair loss.

62. Whether a showerhead or its filters can improve dandruff or reduce hair loss is material to consumers purchasing showerheads.

## COUNT I
### (False Advertising - 15 U.S.C. § 1125 (a))

63. Plaintiff restates and realleges the allegations of paragraphs 1-62 as if fully set forth herein.

64. Through the foregoing conduct, Defendant has made and continues to make false or misleading statements as to the nature and qualities of its showerheads in the advertising or promotion of those showerheads.

65. Defendant's advertising statements set forth above and highlighted in Exhibit A, which include stating a false maximum flow rate for Defendant's showerheads, falsely certifying the showerheads as compliant in the CEC and DOE databases, and presenting false comparisons of the spray force of its showerheads with that of competitors are literally false.

66. Defendant's advertising statements set forth above and highlighted in Exhibit B, which include representations that Defendant's showerhead nozzles are made of a special stay-clean material, are literally false.

67. Defendant's comparative advertising of Interlink's diverter, reflected in Exhibit C, is literally false. Interlink's diverter is not susceptible to the corrosion or other degradation pictured in Defendant's advertising.

68. Defendant's claims that its filter showerheads improve dandruff and hair loss are unsubstantiated and, on information and belief, literally false.

69. Defendant's false and misleading statements regarding its showerheads and Interlink's diverter are literally false, deceived and continue to deceive consumers, and otherwise have the tendency to deceive potential purchasers of Defendant's and Interlink's showerheads.

70. The deception brought about by Defendant's false and misleading statements detailed in the preceding paragraphs was and is material in that those statements likely influenced

and will continue to influence purchasing decisions concerning Defendant's and Interlink's showerheads.

71. Defendant's showerheads travel in interstate commerce.

72. Defendant's false and misleading statements regarding its showerheads and Interlink's showerheads are broadly disseminated in commerce through Defendant's advertising on Amazon and Defendant's product information listed in MAEDbS and the DOE compliance certification database.

73. Defendant's deceptive conduct has caused and will continue to cause immediate and irreparable injury to Interlink, including declining sales, unfair price competition and loss in market share, for which there is no adequate remedy at law.

74. Defendant's conduct is ongoing and intentionally deceptive.

75. At all relevant times, Defendant knew the representations at issue in its advertising and promotional statements were false and misleading and made those representations with the intent to deceive purchasers.

76. Defendant's foregoing advertising and promotional statements are likely to deceive, and on information and belief, have deceived purchasers.

77. Absent Defendant's misrepresentations, Defendant would not have made its sales of the showerheads at issue in competition with Interlink, and it is likely that Interlink would have made the sales to customers that Defendant made.

78. Defendant's foregoing conduct described in the preceding sections and paragraphs of this Complaint was undertaken willfully and with the intention of causing confusion, mistake or deception, making this an exceptional case within the meaning of 15 U.S.C. § 1117(a) entitling

Interlink to an award of enhanced damages, enhanced disgorgement of profits, and reasonable attorney's fees.

79. The acts of Defendant described herein have been and continue to be in bad faith and conscience and in deliberate disregard of Interlink's rights and with the intention of depriving Interlink of monies that Interlink otherwise would receive or have received.

80. Accordingly, Interlink is entitled to judgment awarding it preliminary and permanent injunctive relief, treble damages, enhanced disgorgement of profits, attorneys' fees, costs and any other relief the court deems just.

## COUNT II
### (Common Law Unfair Competition)

81. Plaintiff restates and realleges the allegations of paragraphs 1-80 as if fully set forth herein.

82. Through the foregoing conduct, including without limitation the deceptive inflation of Defendant's Amazon customer ratings through the sale of illegal showerheads marketed as 1.8 gpm showerheads, and the corresponding competitive harm to Interlink, Defendant has committed common law unfair competition.

83. Through the foregoing conduct, Defendant has acted in wanton and willful disregard of Interlink's rights such that Interlink is entitled to an award of punitive damages.

84. Accordingly, Interlink is entitled to judgment awarding it preliminary and permanent injunctive relief, compensatory damages, punitive damages, and any other relief the court deems just.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendant as follows:

I. That Defendant, its officers, agents, servants, employees, attorneys, privies, subsidiaries, divisions, successors and assigns, and all persons and organizations in active concert, participation or combination with any of the foregoing be permanently enjoined from and/or ordered to:

A. Cease making or employing the false and misleading statements that are the subject of this Complaint; and

B. Cease selling showerhead products for a period sufficient to correct for any gains in market share and goodwill attributable to the conduct on which Interlink's claims are based.

C. Cease selling any products under Amazon ASINs, and corresponding product listings and reviews, of products as to which Defendant misrepresented the maximum flow rate of the product.

II. That Plaintiff obtain the following relief:

A. An accounting and disgorgement of all profits Defendant has gained through the sale of showerheads sold under the false and misleading statements at issue;

B. Compensatory damages;

C. Treble damages;

D. Enhanced disgorgement of profits;

E. Reasonable attorneys' fees and costs;

F. Punitive damages in an amount not less than $7 million; and

G. Any other relief in Interlink's favor that the court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable by jury.

Dated: April 5, 2024

Respectfully submitted,

The Law Office of
JASON B. LATTIMORE, ESQ. LLC

By  s/ Jason B. Lattimore
    Jason B. Lattimore
    55 Madison Avenue, Suite 400
    Morristown, NJ 07960
    Telephone: (973) 998-7477
    Facsimile:  (973) 264-1159

*Counsel for Plaintiff*
*Interlink International Products, Inc.*

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to Local Civil Rule 11.2, I hereby certify under penalty of perjury that, to the best of my knowledge, the matter in controversy is not the subject of any other action pending in any other court or of any pending arbitration or administration proceeding.

Dated: April 5, 2024

s/ Jason B. Lattimore
Jason B. Lattimore